# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| TERRANCE J. SHAW,<br><br>      Plaintiff,<br><br>v.<br><br>PAUL S. KEMPER, MS. DIEBOLD, SERGEANT MAYS, MICHELLE BONES, BRAD HOMPE, and CINDY O'DONNELL,<br><br>      Defendants. | Case No. 21-CV-323-JPS<br><br>**ORDER** |

    Plaintiff Terrance J. Shaw, who was an inmate at Racine Correctional Institution ("RCI") at the time that he filed his complaint, filed this pro se action under 42 U.S.C. § 1983 alleging that various defendants at RCI violated his constitutional rights. ECF No. 1.[1] Plaintiff has paid the $402 filing fee, but the Court must still screen the complaint. 28 U.S.C. § 1915A ("The Court shall review . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."). Plaintiff has also filed a motion to appoint counsel and a motion for a protective order. ECF. No. 8. For the reasons explained below, the Court will deny Plaintiff's motion to appoint counsel and grant the motion for a protective order to the extent that the protective order seeks to restrict access to Plaintiff's medical records. The Court will also permit

---

[1]Although Plaintiff has since been released from custody, courts "look to the status of the plaintiff at the time he brings his suit" to determine whether the Prison Litigation Reform Act ("PLRA") applies. *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004).

Plaintiff to proceed on a claim against Sergeant Mays ("Mays") for unconstitutional conditions of confinement under the Eighth Amendment.

1. **SCREENING THE COMPLAINT**

    1.1 **Federal Screening Standard**

    Under the PLRA, the Court must screen complaints brought by prisoners seeking relief from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

    In determining whether the complaint states a claim, the Court applies the same standard that applies to dismissals under Federal Rule of Civil Procedure 12(b)(6). *See Cesal v. Moats*, 851 F.3d 714, 720 (7th Cir. 2017) (citing *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 899 (7th Cir. 2012)). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

    To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right was acting under the color of state law. *D.S. v. E. Porter Cnty. Sch. Corp.*, 799

F.3d 793, 798 (7th Cir. 2015) (citing *Buchanan–Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The Court construes pro se complaints liberally and holds them to a less stringent standard than pleadings drafted by lawyers. *Cesal*, 851 F.3d at 720 (citing *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015)).

### 1.2   Plaintiff's Allegations

On May 5, 2018, at around 9:20 p.m., Plaintiff, who is wheelchair-bound, sought permission from Mays to use the restroom. ECF No. 1 ¶ 8. At the time, Mays had been tasked with counting the inmates in the unit to ensure presence and order. Plaintiff was elderly, incontinent, and needed the use the restroom. He was in a dry cell, which lacked a toilet, and thus he needed assistance from RCI staff to relieve himself. However, Mays did not allow Plaintiff to use the restroom. Plaintiff had no choice but to urinate on himself. Plaintiff contends that he requested permission to use the restroom *after* Mays successfully finished the count, thereby suggesting that there was no good reason for Mays to deny Plaintiff's request.[2]

That same day, Plaintiff filed an inmate complaint, claiming that May had been deliberately indifferent to Plaintiff's needs. On June 6, 2018,

---

[2] By way of background, it appears that Plaintiff used to be in a wet cell (i.e., a cell with toilet facilities), but he was moved to a dry cell, (i.e., a cell with no toilet) "due to . . . filing the submission of multiple Inmate Complaints, where he continued to complain to Unit Staff and Unit Manager Diebold about his [Americans with Disability Act ("ADA")] needs." *Id.* ¶ 17. It is not clear from this paragraph if Plaintiff's move to the dry cell was an accommodation or an act of retaliation. Later in the complaint, Plaintiff explains that the unit manager of his former wet cell, Kreuger, kicked him out, but the circumstances are again unclear. Plaintiff's status as a disabled person implicates the ADA and Rehabilitation Act (the "RA") insofar as his housing placement is concerned, and the Court infers that the dry cell was not suitable for Plaintiff. However, Plaintiff's complaint does not focus on his placement in the dry cell; rather, it focuses on RCI staff's (1) failure to let Plaintiff use the restroom on the night of May 5, 2018; and (2) unsatisfactory resolution of his complaint. Therefore, the Court will not evaluate any claims under the ADA or RA, but Plaintiff may amend his complaint to allege these claims.

Inmate Complaint Examiner Michelle Bones ("ICE Bones") responded to the complaint. ICE Bones noted that there was "no indication that [Plaintiff] communicated the urgency of his need to the sergeant . . . .There is no indication that he made such a claim. . . . The complainant is encouraged to reconsider his denial of the urinal." *Id.* ¶ 13. Plaintiff found this response unsatisfactory because it failed to reckon with the fact that Plaintiff asked permission to use the restroom *after* the count. *Id.* ¶ 14. He further contends that ICE Bones herself acted with deliberate indifference to his medical needs because she did not take this fact into consideration or otherwise endeavor to investigate his claim. *Id.* ¶ 15. He feels that he has been blamed for a situation that was beyond his control. *Id.* ¶ 17. On June 22, 2018, Warden Paul Kemper ("Kemper") issued a "partial determination" on this issue, which effectively approved ICE Bones's conclusions.

On June 29, 2018,[3] Plaintiff appealed this determination. He explained that Mays was an "angry, negative human-being towards inmates" and noted that Plaintiff's various complaints were "continual," such that his unit manager, Diebold, would have been aware of his incontinence. *Id.* ¶ 19. Plaintiff explained that he had been kicked out of his wet cell, and, although RCI staff offered him use of a urine receptacle (which Plaintiff refers to as a "pee bottle"), his cellmate was totally intolerant to this course of action. Moreover, Plaintiff has waning hand strength, which would have left him unable to grasp the receptacle effectively.

---

[3]The complaint says 2020, but this appears to be a typo given that no other dates in the complaint occurred in 2020.

Page 4 of 17
Case 2:21-cv-00323-JPS    Filed 05/17/22    Page 4 of 17    Document 10

On July 12, 2018, Complaint Corrections Examiner Brad Hompe ("Hompe") denied the appeal, stating that "[Plaintiff] presented no information to warrant a recommendation overturning that decision." *Id.* ¶ 22. Hompe also noted that the 9:15 p.m. count finished at 9:21 p.m. on the day in question—one minute after Plaintiff says he sought permission to use the facilities. *Id.* On August 1, 2018, Cindy O'Donnell ("O'Donnell"), an employee at the Office of the Secretary, dismissed Plaintiff's complaint because "[i]t is important not to have movement 'during' count . . . the complainant should plan ahead and use the bathroom prior to count." *Id.* ¶ 25. This statement failed to credit Plaintiff's allegation that he sought to use the restroom *after* the count finished, which he had made clear throughout the complaint process. Like Hompe and ICE Bones before her, Plaintiff contends that O'Donnell also failed to make a good faith effort to investigate his complaint and evinced deliberate indifference to his situation.

### 1.3    Analysis

Plaintiff's allegations invoke his Eighth Amendment right to be free from cruel and unusual punishment. In particular, prisoners have a right to certain necessities of life such as "adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). They are also entitled to "sanitation[] and hygienic materials." *Myers v. Ind. Dep't of Corr.*, 655 F. App'x 500, 503 (7th Cir. 2016). Whether a particular deprivation violates the Eighth Amendment depends in large measure on its duration. *Id.* at 504. "A prisoner challenging conditions of confinement must first [allege] that the conditions were sufficiently serious as an objective matter, meaning that they den[ied] the inmate the minimal civilized measures of life's necessities, creating an excessive risk to the inmate's health and

Page 5 of 17
Case 2:21-cv-00323-JPS    Filed 05/17/22    Page 5 of 17    Document 10

safety." *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (citations and quotations omitted). Second, the prisoner must allege that prison officials evinced deliberate indifference, i.e., that they "knew of and disregarded this excessive risk of harm." *Id.* At this juncture, "knowledge and intent may be pleaded generally (which is to say, in a conclusory fashion), the lack of detail does not permit dismissal." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).

In the present case, Plaintiff alleges that Mays failed to ensure his access to a restroom, forcing Plaintiff to urinate on himself. Plaintiff explains that he sought permission to use the restroom *after* Mays completed the count, thereby suggesting there was no good reason to deny the request. Mays would have noticed Plaintiff's age and wheelchair, but this apparently did not affect his determination. *Id.* ¶ 10 ("Mays did not ensure [Plaintiff], a paraplegic inmate, could use the toilet, and denied [him] the minimal civilized measure of life's necessities.") (cleaned up). This is sufficient to state a claim for an Eighth Amendment violation.

Plaintiff's allegations as to Diebold, the unit manager, are more tenuous. He explains that Diebold knew that he was an elderly, incontinent, and wheelchair-bound inmate based on his previous complaints to her. However, it is well settled that "[o]nly persons who cause or participate in the violations are responsible" for the constitutional rights violations. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). Plaintiff has not clearly alleged that Diebold caused Plaintiff to urinate on himself or was otherwise involved in his denial of restroom access. Thus, the claim against her will be dismissed.

The same principle applies to Hompe, ICE Bones, O'Donnell, and Kemper, who ruled against Plaintiff in his complaint and appeal. "Ruling

Page 6 of 17
Case 2:21-cv-00323-JPS   Filed 05/17/22   Page 6 of 17   Document 10

against a prisoner on an administrative complaint does not cause or contribute to the violation." *Id.* In *George*, the Seventh Circuit explained that "[a] guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not." *Id.* at 609–10. Certainly, "[o]ne can imagine a complaint examiner doing her appointed tasks with deliberate indifference to the risks imposed on prisoners. If, for example, a complaint examiner routinely sent each grievance to the shredder without reading it." *Raemisch*, 555 F.3d at 595. Such conduct could theoretically give rise to constitutional liability. *Id.* But complaint examiners may not be held responsible for the constitutional failings of their coworkers unless doing so results in its own constitutional violation. *Id.* at 596.

While Plaintiff takes issue with how these administrative actors characterized his complaint and impugns their investigations as lacking good faith, he has failed to state a claim for a constitutional violation because there are no allegations that these actors ignored his complaints or otherwise contributed to his injury. To the contrary, the complaint demonstrates the initial examiners investigated his complaints. *See* ECF No. 1 ¶ 13 (ICE Bones explaining that there was "no indication that the complainant communicated the urgency of his need to the sergeant" and discussing Plaintiff's denial of urinal); *id.* ¶ 22 (Hompe noting when the count ended on the date in question). Moreover, Kemper and O'Donnell, who reviewed the initial determinations, promptly affirmed them and provided responses. *Id.* ¶¶ 18, 25, 26. Finally, there are no allegations that any of these administrative actors either contributed to the violation or otherwise violated Plaintiff's rights by sabotaging his complaint process. The fact that the administrators all failed to credit Plaintiff's allegation that

he asked permission to use the restroom *after* count is insufficient to hold them liable for a constitutional violation. Therefore, the claims against Hompe, ICE Bones, O'Donnell, and Kemper must be dismissed.

2.  **MOTION TO APPOINT COUNSEL**

As a civil litigant, Plaintiff has "neither a constitutional nor statutory right to a court-appointed attorney." *James v. Eli*, 889 F.3d 320, 326 (7th Cir. 2018). However, under 28 U.S.C. § 1915(e)(1), a "court may request an attorney to represent any person unable to afford counsel." A court should seek counsel to represent a plaintiff if: (1) he has made reasonable attempts to secure counsel; and (2) "'the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it.'" *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (quoting *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007) (en banc)). Whether to appoint counsel in a particular case is left to a court's discretion. *James*, 889 F.3d at 326; *McCaa v. Hamilton*, 893 F.3d 1027, 1031 (7th Cir. 2018).

While framed in terms of a plaintiff's capacity to litigate, this discretion must also be informed by the realities of recruiting counsel in this District. When a court recruits a lawyer to represent a pro se party, the lawyer takes the case pro bono. Unlike a lawyer appointed to represent a criminal defendant during his prosecution, who is paid by the government for his work, an attorney who takes a prisoner's civil case pro bono has no promise of compensation.

It is difficult to convince local lawyers to take such cases. Unlike other districts in this Circuit, *see, e.g.*, L.R. 83.35 (N.D. Ill.), the Eastern District of Wisconsin does not employ an involuntary appointment system for lawyers admitted to practice in the District. Instead, the District relies on the willingness of lawyers to sign up for the Pro Bono Attorney Panel

and, once there, accept appointments as needed. *See* Pro Bono Program, *available at*: http://www.wied.uscourts.gov/pro-bono-program.

The District is grateful to the lawyers who participate in the Pro Bono Program, but there are never enough volunteers, and those who do volunteer rarely take more than one or two cases a year. This is understandable, as many are already busy attending to fee-paying clients. Although the Pro Bono Program does provide for payment of certain litigation expenses, it does not directly compensate a lawyer for his or her time. Participants may seek attorney's fees when permitted by statute, such as in successful § 1983 cases, but they will otherwise go unpaid. The small pool of attorneys available to this District for pro bono appointments stands in stark contrast to that of the Court of Appeals, which regularly recruits counsel from across the nation to represent pro se plaintiffs on appeal. *See, e.g.*, *James*, 889 F.3d at 323 (appointing counsel from Washington, D.C. to represent the pro se appellant); *McCaa*, 893 F.3d at 1029 (same).

Finally, it must be remembered that, when a court determines that counsel recruitment is appropriate, it can take months to locate a willing lawyer. This delay works to the detriment of all parties and contravenes Congress's instruction in Federal Rule of Civil Procedure 1 that district courts must endeavor to secure the "just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Thus, looming large over each request for counsel are a court's ever-more-limited time and resources.

With these considerations in mind, the Court returns to the question presented: whether counsel can and should be recruited to represent Plaintiff at this stage in this case. First, a court asks whether the litigant has made "reasonable" efforts to obtain his own representation. *Pruitt*, 503 F.3d at 655; *Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992). It is a

question not often litigated; many district court judges either overlook arguably unreasonable efforts at obtaining counsel, or they impose eminently practical requirements such as the submission of evidence demonstrating that the prisoner has tried and failed to secure representation from several lawyers. *See, e.g.*, *Kyle v. Feather*, No. 09-cv-90-bbc, 2009 WL 2474627, at *1 (W.D. Wis. Aug. 11, 2009).

The first element of *Pruitt* is fairly easy to satisfy, but it is not toothless, and it is not a mere technical condition of submitting a certain number of rejection letters. If it was, then a Wisconsin prisoner litigating a § 1983 action could submit rejection letters from ten randomly selected criminal defense lawyers from Nevada and call his work complete. This cannot be. The purpose of the reasonable-efforts requirement is to ensure that if a court and private lawyers must expend scarce resources to provide counsel for a prisoner, he has at least made a good-faith effort to avoid those costs by getting a lawyer himself. To fulfill this duty, a pro se prisoner should reach out to lawyers whose areas of practice suggest that they might consider taking his case. If he learns that some of the lawyers he has contacted do not, he should reach out to others before he concludes that no one will help him.

In this case, Plaintiff has attached emails from several attorneys in the Wisconsin area with civil rights practice, which demonstrate a good faith effort to secure appropriate counsel in this matter. *See* ECF No. 9-1 at 1–6. The Court is satisfied that he has accomplished the first step of the *Pruitt* analysis.

But Plaintiff's request must also succeed on the second *Pruitt* question: whether the difficulty of the case exceeds his capacity to coherently present it. This assessment must be made in light of the

particular capabilities and circumstances presented by each pro se litigant. *James*, 889 F.3d at 326–27. The Court of Appeals explains:

> The second step is itself grounded in a two-fold inquiry into both the difficulty of the plaintiff's claims and the plaintiff's competence to litigate those claims himself. The inquiries are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand. Ultimately, the question is not whether a lawyer would present the case more effectively than the pro se plaintiff; if that were the test, district judges would be required to request counsel for every indigent litigant. Rather, the question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself. Notably, this inquiry extends beyond the trial stage of the proceedings. The relevant concern is whether the plaintiff appears competent to litigate his own claims, given their degree of difficulty. This includes all of the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.

*Id.* (citations and quotations omitted). While a court need not address every concern raised in a motion for appointment of counsel, it must address "those that bear directly" on the individual's capacity to litigate his case. *McCaa*, 893 F.3d at 1032.

The balancing contemplated in the second *Pruitt* step must be done against the backdrop that district courts cannot be expected to appoint counsel in circumstances which are common to all or many prisoners. *See Bracey v. Grondin*, 712 F.3d 1012, 1017–18 (7th Cir. 2013); *Pruitt*, 503 F.3d at 656 (observing that the Seventh Circuit has "resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); *Harper v. Bolton*, 57 F. Supp. 3d 889, 893 (N.D. Ill. 2014). Doing so

would place untenable burdens on court resources. It would also turn the discretion of § 1915(e)(2) on its head, making appointment of counsel the rule rather than the exception.

Several pronouncements from the Court of Appeals appear to be in tension with this principle. First, the Seventh Circuit notes that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation." *James*, 889 F.3d at 327. It deems the "[a]dvanced phases" to include those from discovery onward. *Id.*; *McCaa*, 893 F.3d at 1032. But nearly every prisoner case proceeds to discovery, as the district court applies exceedingly lenient review during initial screening.

Second, the Seventh Circuit instructs that district courts should evaluate a prisoner's competency irrespective of the involvement of a "jailhouse lawyer." *McCaa*, 893 F.3d at 1033; *Walker v. Price*, No. 17-1345, 2018 WL 3967298, at *5 (7th Cir. Aug. 20, 2018). How courts should do this is not clear. A court rarely knows whether a filing was prepared by the plaintiff or someone helping him. And if a court does know that the plaintiff is receiving help, how can it assess his ability to litigate without knowing which portions of the filings are his work, and which come from the jailhouse lawyer? In *Walker*, the court determined that the inmate's work product decreased in quality after his jailhouse lawyer was transferred to another prison. 2018 WL 3967298, at *6. Yet a savvy prisoner, looking to secure counsel for himself, could do this on purpose, crafting his filings to downplay his own litigation capabilities. A court would have no way to assess whether the inmate is sandbagging it.

Finally, the Court of Appeals indicates that claims involving the state of mind of the defendant, such as those involving deliberate indifference, are particularly complex. *James*, 889 F.3d at 327–28; *McCaa*, 893 F.3d at 1032.

Yet a government official's culpable mental state is the foundation for most constitutional claims. Indeed, it is often the defining characteristic that sets § 1983 claims apart from their state-law tort analogues. Deliberate indifference is essential to nearly all claims of cruel and unusual punishment, excessive force, mistreatment of medical needs, and First Amendment and due process violations. *See Kingsley v. Henderson*, 135 S. Ct. 2466, 2473 (2015); *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Hambright v. Kemper*, 705 F. App'x 461, 462 (7th Cir. 2017); *Milton v. Slota*, 697 F. App'x 462, 464 (7th Cir. 2017) ("*[N]egligently* inflicted harm does not amount to a constitutional violation.") (emphasis in original). Taken together, these claims comprise the vast majority of prisoner litigation in this District. If state-of-mind issues are generally beyond the ability of most pro se litigants to prove, then a court likely would need to appoint counsel in nearly every prisoner case. This is plainly impossible.

The guiding rule has always been that appointment of counsel is the exception rather than the rule in pro se prisoner litigation. Yet a confluence of all-too-common circumstances—discovery, jailhouse lawyers, and claims concerning state of mind—militate in favor of the appointment of counsel. As the list of reasons to appoint counsel grows, the reasons not to do so shrink. This District's resources have not kept pace.

Against this backdrop, the Court finds that Plaintiff has not presented sufficient evidence and argument showing that he cannot litigate or try this matter competently on his own. Plaintiff explains that he is 73 years old, and the Veteran's Administration recently diagnosed him with a "mild cognitive impairment." ECF No. 9-1 at 7. This fact certainly weighs in favor of appointing counsel. But there are also facts weighing against it.

Page 13 of 17
Case 2:21-cv-00323-JPS   Filed 05/17/22   Page 13 of 17   Document 10

First, Plaintiff is a prodigious (and occasionally successful) litigant, who has a better-than-average grasp on both procedural rules and substantive law when compared to most pro se litigants, notwithstanding his mild cognitive impairment. Second, Plaintiff is no longer in custody, so his ability to access public law libraries and legal clinics, and to spend his time and resources litigating his cases, is unrestrained by prison policies. Finally, this matter is currently at the pleadings stage, which is less complex than discovery, motion practice, and trial. At this juncture, in this particular matter, the Court finds that appointment of counsel is not appropriate. This may change depending on the case's progression and any changes in Plaintiff's cognitive abilities. The Court additionally notes that Plaintiff has secured counsel in one of his appeals, which is currently pending before the Seventh Circuit. *See Shaw v. Kemper*, No. 21-3265 (7th Cir. 2021). It may be worthwhile for Plaintiff to explore whether this attorney could offer assistance or otherwise refer counsel.

### 3. CONCLUSION

In light of the foregoing, the Court finds that Plaintiff may proceed on the following claim pursuant to 28 U.S.C. § 1915A(b):

**Claim One:** An Eighth Amendment claim against Mays for cruel and unusual conditions of confinement.

The Court will deny Plaintiff's request for counsel. The Court also notes that Plaintiff's motion to appoint counsel includes a request for a protective order, though the substance of the motion is focused on the motion to appoint counsel. To the extent that Plaintiff's motion for a protective order seeks to protect the medical documents appended to his motion to appoint counsel, the Court will grant the request and order the Clerk of Court to restrict access to the documents found at ECF No. 9-1.

The Court has enclosed with this Order guides prepared by court staff to address common questions that arise in cases filed by prisoners. These guides are entitled, "Answers to Prisoner Litigants' Common Questions" and "Answers to Pro Se Litigants' Common Questions." They contain information that Plaintiff may find useful in prosecuting his case.

Accordingly,

**IT IS ORDERED** that Defendants Paul S. Kemper, Ms. Diebold, Michelle Bones, Brad Hompe, and Cindy O'Donnell be and the same are hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that under an informal service agreement between the Wisconsin Department of Justice and this Court, a copy of the complaint and this Order have been electronically transmitted to the Wisconsin Department of Justice for service on Defendant Sergeant Mays;

**IT IS FURTHER ORDERED** that under the informal service agreement, Defendant Sergeant Mays shall file a responsive pleading to the complaint within 60 days;

<u>**IT IS FURTHER ORDERED** that Defendant Sergeant Mays raises any exhaustion-related challenges by filing a motion for summary judgment within forty-five (45) days of service or this affirmative defense is waived</u>;

**IT IS FURTHER ORDERED** that Plaintiff's motion to appoint counsel, ECF No. 8, be and the same is hereby **DENIED**; however, to the extent Plaintiff seeks to restrict access to his medical records, that request is **GRANTED**; the Clerk of Court is ordered to restrict access to ECF No. 9-1 to protect Plaintiff's medical records; and

Page 15 of 17
Case 2:21-cv-00323-JPS   Filed 05/17/22   Page 15 of 17   Document 10

**IT IS FURTHER ORDERED** that the Clerk's Office mail Plaintiff a copy of the guides entitled "Answers to Prisoner Litigants' Common Questions" and "Answers to Pro Se Litigants' Common Questions," along with this Order.

Dated at Milwaukee, Wisconsin, this 17th day of May, 2022.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

---

Plaintiffs who are inmates at Prisoner E-Filing Program institutions shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. Prisoner E-Filing is mandatory for all inmates at Columbia Correctional Institution, Dodge Correctional Institution, Green Bay Correctional Institution, Oshkosh Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility.

Plaintiffs who are inmates at all other prison facilities, or who have been released from custody, will be required to submit all correspondence and legal material to:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

**DO NOT MAIL ANYTHING DIRECTLY TO THE COURT'S CHAMBERS**. If mail is received directly to the Court's chambers, **IT WILL BE RETURNED TO SENDER AND WILL NOT BE FILED IN THE CASE**.

> Plaintiff is further advised that failure to timely file any brief, motion, response, or reply may result in the dismissal of this action for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. **IF PLAINTIFF FAILS TO PROVIDE AN UPDATED ADDRESS TO THE COURT AND MAIL IS RETURNED TO THE COURT AS UNDELIVERABLE, THE COURT WILL DISMISS THIS ACTION WITHOUT PREJUDICE**.